**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES M. EDWARDS,**

                                    **Plaintiff,**

          **vs.**                                                  **5:07-CV-898**
                                                                   **(NAM/DEP)**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                    **Defendant.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

Legal Services of Central New York          Christopher Cadin, Esq.
472 South Salina Street
Suite 300
Syracuse, New York 13202
_Attorneys For Plaintiff_

Social Security Administration              Maria P. Fragassi Santangelo, Esq.
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorneys for Defendant_

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

          Plaintiff Charles Edwards brings the above-captioned action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3) of the Social Security Act, seeking a review of the Commissioner of Social

Security's decision to deny his application for Supplemental Security Income (SSI) benefits.

**II.     BACKGROUND**

On November 18, 2003, plaintiff protectively filed an application for SSI.  (T. 46, 61)[1].

Plaintiff was 51 years old at the time of his application and alleged an inability to work due to

diabetes, high blood pressure, heart problems, neuropathy, stomach problems, a weak bladder,

vision problems, depression and osteoporosis.  (T. 21, 79).  Plaintiff completed high school and

was a migrant farm worker from age 12 to age 50.  (T. 110, 135).

On January 27, 2004, plaintiff's application was denied and plaintiff requested a hearing

by an ALJ which was held on September 13, 2004.[2]  (T. 47, 220).   On January 21, 2005, the ALJ

issued a decision denying plaintiff's claim for disability benefits.  (T. 20-31).  The Appeals

Council denied plaintiff's request for review on June 27, 2007, making the ALJ's decision the

final determination of the Commissioner. (T. 4).  This action followed.

## III.    DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to

individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability

claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2)
> that he has a 'severe impairment,' (3) that the impairment is not one [listed in
> Appendix 1 of the regulations] that conclusively requires a determination of disability,
> and (4) that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the

[1]  "(T. )" refers to pages of the administrative transcript, Dkt. No. 9.

[2]  The hearing was originally scheduled for July 13, 2004.  Plaintiff appeared on that date and requested an adjournment to obtain legal representation. (T. 212-217).

2

claimant can do." The claimant bears the burden of proof on the first four steps, while
the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311
F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal
citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the
factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*,
221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set
aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d
72, 77 (2d Cir. 1999).

On January 21, 2005, the ALJ found at step one that plaintiff has not engaged in
substantial gainful activity since December 24, 2002.  (T. 21).  At step two, the ALJ concluded
that plaintiff suffered from diabetes, neuropathy, multiple foot impairments, cognitive and
depressive disorders and borderline intellectual function which qualified as "severe impairments"
within the meaning of the Social Security Regulations (the "Regulations").  (T. 22-23, 30).  At the
third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal
the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 25).  The ALJ found
that plaintiff had the residual functional capacity ("RFC") to "perform light exertional activities
of occasional lifting of twenty (20) pounds and more frequent lifting of ten (10) pounds.  I grant
the claimant the benefit of the doubt in regard to his foot pain, and further limit him to standing at
one hour intervals."  (T. 27).  The ALJ also found that plaintiff retained the ability to perform
simple routine work without significant public contact.  Accordingly, the ALJ found that plaintiff

was unable to perform his past relevant work. (T. 28). The ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform.  Based upon the vocational expert's testimony, the ALJ concluded at step five, that plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy such as work as a slicing machine tender, label pinker and semi-conductor bonder. (T. 29).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 31).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ failed to properly evaluate plaintiff's claim under Section 12.05(c); (2) the RFC analysis is not supported by substantial evidence; and (3) the ALJ failed to properly evaluate the vocational evidence and thus, the Commissioner did not sustain his burden of proof at the fifth step of the sequential evaluation process. (Dkt. No. 12).

**A.     Section 12.05(c)**

For purposes of Social Security benefits, as an adult, in order to be considered disabled due to mental retardation certain criteria are necessary. *Meashaw v. Chater*, 1997 WL 16345, *3 (N.D.N.Y. 1997).

Listing 12.05 states, in relevant part:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C.      A valid verbal, performance, or full scale IQ of 60 through 70

and a physical or other mental impairment imposing an additional and
significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Plaintiff argues that his impairments meet or medically equal Listing 12.05(c).
Specifically, plaintiff claims that his IQ scores are within the Listing level.  Moreover, plaintiff
claims that he suffers from physical and mental impairments that impose additional and
significant work-related limitation of function to satisfy the second prong of § 12.05(c). (Dkt. No.
12, p. 15).  While plaintiff claims that he meets the criteria for subsection (c) of Listing 12.05,
plaintiff failed to address the introductory paragraph of Listing 12.05.  Plaintiff did not provide
any argument or cite to any evidence establishing that he suffered from subaverage intellectual
function with adaptive functioning deficits initially manifested before age 22.  Even assuming the
evidence comports with the criteria of Listing 12.05(c), in order to satisfy the definition of mental
retardation, plaintiff must meet all the criteria of that Listing.  *Sullivan v. Zebley*, 493 U.S. 521,
530 (1990).  Accordingly, before addressing the requirements of subsection (c) of 12.05, the
Court must analyze the evidence and determine whether plaintiff's impairments satisfy the
introductory paragraph of the Listing.  *See Paulino v. Astrue*, 2010 WL 3001752, at *21
(S.D.N.Y. 2010).

### 1.    Deficits in Adaptive Functioning

Deficits in adaptive functioning "denote[] an inability to cope with the challenges of
ordinary everyday life".  *Carrube v. Astrue*, 2009 WL 6527504, at *4 (N.D.N.Y. 2009) (citing
*Novy v. Astrue*, 492 F.3d 708, 710 (7th Cir. 2007)).  "Adaptive functioning includes a claimant's
effectiveness in areas such as social skills, communication, and daily living skills."  *Id.* at *5
(citing *West v. Comm'r of Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (unpublished

decision)).   Courts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22: evidence a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math. *MacMillan v. Astrue*, 2009 WL 4807311, at *6 (N.D.N.Y. 2009) (citing, *inter alia, Christner v. Astrue*, 498 F.3d 790,793 (8th Cir.2007)).   A plaintiff who can dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs does not suffer from adaptive deficits. *See Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815 (11th Cir. 2009).   An ALJ is entitled to consider plaintiff's work and social history including plaintiff's relationships when making a factual finding on this issue.   *Ali v. Astrue*, 2010 WL 889550, at *6 (E.D.N.Y. 2010) (the record did not compel the conclusion that the plaintiff suffered from adaptive function deficits prior to the age of 22 because of a lack of diagnosis and the fact that the plaintiff worked for many years).   Moreover, the fact that no medical professional actually diagnosed a claimant with mental retardation is relevant.   *Id*.

Here, the record does not contain any reports from any treating mental health professional or any school records.   The only evidence concerning plaintiff's mental impairments and/or cognitive abilities are consultative reports from Brett T. Hartman, Psy.D, and a Psychiatric Review Technique and Mental Residual Functional Capacity evaluation completed by P.A. Spearman, Ph.D.

On December 30, 2003, Brett T. Hartman, Psy.D. examined plaintiff at the request of the agency.   Dr. Hartman completed a psychiatric and organicity report. (T. 135).   Dr. Hartman administered WAIS-III IQ testing which revealed a verbal IQ score of 69, a performance IQ score

of 64 and a full scale IQ score of 64.[3] (T. 137).  Dr. Hartman also administered a reading test and found plaintiff's skills equivalent to the 4th grade level. (T. 137).  Dr. Hartman noted that plaintiff functioned in the "deficient range of intelligence overall". (T. 137).  Although the test results supported a diagnosis of mild mental retardation, Dr. Hartman opted for a more conservative approach and diagnosed plaintiff with borderline intellectual functioning and cognitive disorder.  Dr. Hartman also diagnosed plaintiff with major depressive disorder - mild to moderate - without psychotic features. (T. 139).  Dr. Hartman provided a Medical Source Statement and opined that plaintiff could follow and understand simple directions and instructions; had a fair ability to make appropriate decisions; and had mild attention and concentration problems.  Dr. Hartman concluded that plaintiff had: mild difficulty learning new tasks with intellectual deficits which may interfere with his ability to perform complex tasks independently; mild difficulty relating adequately with others; and would have moderate problems dealing with normal stressors of life. (T. 139).

On January 23, 2004, Dr. Spearman reviewed plaintiff's medical records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity.  Dr. Spearman opined that plaintiff exhibited moderate limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods and complete a normal workday/workweek without psychologically based interruptions. (T. 28).  Dr. Spearman opined that plaintiff was capable of "simple work". (T. 162).

Here, the ALJ discussed plaintiff's activities of daily living which included "adaptive activities":

_____

[3] WAIS is an abbreviation for the Wechler Adult Intelligence Scale.  http://www.medilexicon.com (last visited August 17, 2010).

The claimant testified that he lives alone and is able to care for his own personal hygiene and grooming, and that with the assistance of his sister-in-law and neighbor, he does his own laundry and cleaning. (T. 25).

The ALJ also noted that from childhood until approximately seven years ago, plaintiff was a harvest farm worker and from December 2002 until April 2004, plaintiff worked as a janitor. (T. 26). The ALJ discussed the fact that plaintiff has a high school education, attended regular classes and has a driver's license.[4] (T. 23). Additionally, the record reveals that plaintiff never received any psychological/psychiatric treatment or mental health counseling and was not taking any medication to treat any mental condition. (T. 135, 162). Plaintiff indicated that he was able to read, write and understand English. (T. 79). The record lacks any results of intelligence tests, administered at any age, other than the testing performed by Dr. Hartman. Moreover, the record does not contain any evidence that plaintiff has difficulties with social interaction or dealing with stress. Plaintiff stated that he goes to church, Bible study classes and the Rescue Mission. (T. 90). Plaintiff is able to go to the bank and use an ATM with his pin number. (T. 89). Plaintiff denied experiencing any problems getting along with family, friends, neighbors or others. (T. 89). While the ALJ did not specifically address the introductory paragraph, the evidence of record permits the Court to glean the rationale for the ALJ's decision. *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Crane v. Astrue*, 369 F. App'x 915, 921 (10th Cir. 2010) ("[G]iven that [the plaintiff] had a GED and a steady work history, which included jobs at the semi-skilled and skilled levels, the ALJ understandably did not discuss this Listing). Based upon the record, plaintiff does not suffer from an impairment beginning before age 22 that meets the

---

[4] In a Function Report for the New York State Office of Temporary and Disability Assistance dated November 2003, plaintiff indicated that he "needs a license". (T. 88). During the administrative hearing, plaintiff testified that he had a driver's license. (T. 224).

introductory paragraph of Listing 12.05.

**2.    IQ Scores**

Even assuming plaintiff's impairments meet the criteria of the introductory paragraph, plaintiff must then present evidence that his impairments satisfy subsection (c). An IQ score of 60 - 70 is not conclusive of mental retardation. *Outlaw v. Barnhart*, 197. F. App'x 825, 827 (11th cir. 2006). An ALJ is permitted to reject an IQ score as invalid when it is inconsistent with the record but must explain the basis for that decision. *See Paulino v. Astrue*, 2010 WL 3001752, at *22 (S.D.N.Y. 2010) (citations omitted); *see also Markle v. Barnhart*, 324 F.3d 182, 189 (3rd Cir. 2003) (the ALJ found that the IQ scores were inconsistent with the plaintiff's work history and with having a driver's license); *see also Christner v. Astrue*, 498 F.3d 790, 794 (8th Cir. 2007) (holding that the ALJ may disregard an IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if it is inconsistent with the plaintiff's activities).

Here, the ALJ addressed Dr. Hartman's test results and opinions and found:

> Although Wechsler Adult Intelligence Scale-III (WAIS III) testing performed during the consultative examination by Dr. Hartman, shows the claimant's performance IQ score of 64, a verbal IQ score of 69 and a full scale IQ score of 64, based on clinical observations, psychological testing, and the evidence of record, he concluded that the claimant has borderline intellectual functioning and not mild mental retardation. I accept this assessment and find it to be consistent with the overall record. The claimant has a history of significant drinking and marijuana use. He, nevertheless, attended regular classes and achieved a high school education. He has a valid driver's license. Based on all of the foregoing, I find that the claimant does not have mild mental retardation and does not have an impairment that meets the criteria of listing 12.05C. (T. 24).

Plaintiff's IQ scores are clearly within the defined parameters but the ALJ found the scores, which were obtained by a consulting examiner, to be inconsistent with other evidence in

the record.  The ALJ provided sufficient rationale for failing to give significant weight to the scores and relied upon Dr. Hartman's complete evaluation rather than the test results alone.  *See Paulino*, 2010 WL 3001752, at *21 (test results are "only part of the overall assessment," however, and the narrative report accompanying test scores should "comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation) (citing 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(D)(6)(a)).  The ALJ also noted that the test results were inconsistent with plaintiff's school history, work history and the fact that he has a driver's license.  The record is devoid of any other test results or opinions from any treating or consultative source.  Based upon the record, the Court finds the ALJ's determination supported by substantial evidence.

### 3.   Physical/Mental Impairments Imposing Additional and Significant Work-Related Limitation of Function

Even assuming that the plaintiff satisfied the first prong of Listing 12.05(c), plaintiff must still establish that he suffers from a physical or mental impairment that imposed additional limitations.  This Circuit has not yet ruled on what test should be utilized in determining whether a claimant's "physical or other mental impairment", other than his low IQ imposes a significant work-related limitation.  *Keitt v. Barnhart*, 2005 WL 1258918, at *4 (E.D.N.Y. 2005).  District Courts in this Circuit have adopted the approach taken by the First, Eighth and Tenth Circuits holding that a limitation other than low IQ is "significant" if the claimant suffers from an additional physical or other mental impairment that is "severe" as that term is defined at step two of the Commissioner's sequential analysis.  *See Baneky v. Apfel*, 997 F.Supp 543, 546 (S.D.N.Y. 1998); *Aviles v. Barnhart*, 2004 WL 1146055, *7 (E.D.N.Y. 2004) (the ALJ's analysis was undertaken in the context of the fourth step and not insightful in determining which impairments

involved more than a *de minimus* limitation).   The Commissioner must specifically determine whether any of the plaintiff's limitations, except for the low IQ, satisfy the second element of Listing 12.05(c).  *Aviles*, 2004 WL 1146055, at *7; *Antonetti v. Barnhart*, 399 F.Supp.2d 199, 202 (W.D.N.Y. 2005); *see also Davis v. Astrue*, 2010 WL 2925357, at *6 (N.D.N.Y. 2010) (the ALJ found the plaintiff's degenerative disc disease to be "severe" within the meaning of 20 C.F.R. 404.1520(c), thus, the determination that the plaintiff did not have an additional physical impairment to satisfy 12.05(c) was not supported by substantial evidence).  Where the ALJ concluded, at step two of the analysis, that the plaintiff suffered from "severe impairments" under the meaning of the regulations, the plaintiff established the second prong of 12.05(c) as a matter of law.  *Ali*, 2010 WL 889550, at *6; *see also May v. Astrue*, 2010 WL 1253646, at * 7 (N.D.N.Y. 2010) (the ALJ found that the plaintiff's mood disorder was a "severe" impairment necessitating a remand for a specific determination as to whether the plaintiff's limitations satisfied the second prong of 12.05(c)).

Here, the ALJ found at step two that plaintiff suffered from diabetes, neuropathy, multiple foot impairments, cognitive and depressive disorders and borderline intellectual function.[5]   The ALJ did not discuss whether plaintiff's diabetes and foot impairment, in accordance with 12.05(c) and without consideration of his low IQ, significantly impaired his ability to do basic work activities.  The failure to engage in that examination does not require remand as the analysis was unnecessary.  Since the ALJ found that plaintiff failed to satisfy the first prong of the 12.05(c) test, plaintiff's argument that he meets the second prong of the test is moot.  *Lebron v. Barnhart*, 2008 WL 2696142, at *8 (S.D.N.Y. 2008) (citing *Alvarado v.*

---

[5] "Borderline intellectual functioning" does not qualify for the purposes of satisfying the impairment requirement.  *DeCarlo v. Astrue*, 2009 WL 1707482, at *4 (N.D.N.Y. 2009).

*Barnhart*, 432 F.Supp.2d 312, 318 n. 3 (W.D.N.Y. 2006) (finding it unnecessary to address the second prong of 12.05(C) when the first prong of the listing has not been met). Remand is not necessary as substantial evidence supports the ALJ's determination that plaintiff did not satisfy the introductory paragraph of Listing 12.05 or the remaining criteria of subsection (c). *See Miller v. Astrue*,  2009 WL 2568571, at *9 (N.D.N.Y. 2009) (citing *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir.1998) ("[w]here application of the correct legal standard could lead only to one conclusions, [the Court] need not remand.")); *see also Miles v. Barnhart*, 2008 WL 5191589, at *7 (N.D.N.Y. 2008) (finding a failure to consider a criterion of a Listing harmless error where "application of the correct legal standard leads inexorably to a single conclusion: plaintiff does not meet the criteria of [a] Listing.").

Based upon the foregoing, the Court finds that the ALJ's determination regarding Listing 12.05(c) is supported by substantial evidence.[6]

**B.     RFC**

Residual functional capacity is:

"what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-

---

[6]   Plaintiff presents a cursory argument regarding the ALJ's duty to develop the record which the Court rejects.  As discussed above, the ALJ had sufficient evidence to determine that plaintiff was not disabled. The reports from all examining physicians, as well as plaintiff's IQ test results, provided the ALJ with substantial evidence about plaintiff's conditions and treatment.  Thus, the ALJ acknowledged the relevant facts in plaintiff's case.  Accordingly, the Court finds this claim to be without merit.

8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  An RFC is the most a claimant can still do

despite limitations.  20 C.F.R. §§ 416.945(a)(1), 404.1545(a)(1).  In making a residual functional

capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis.  20 C.F.R. § 404.1545(a).  The ALJ must make a function by

function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach,

handle, stoop, or crouch, based on medical reports from acceptable medical sources that include

the sources' opinions as to the claimant's ability to perform each activity.  20 C.F.R. §

404.1513(c)(1).  After that analysis is completed, the RFC may be expressed in terms of the

exertional levels of work, sedentary, light, medium, heavy, and very heavy.  *Hogan v. Astrue*,

491 F.Supp.2d 347, 354 (W.D.N.Y. 2007).

Plaintiff argues that the RFC does not contain all of plaintiff's impairments.  Specifically,

plaintiff claims that the ALJ failed to consider his vision problems, heart problems, stomach

issues and diarrhea when formulating the RFC.  Plaintiff also claims that the RFC did not include

his "severe mental impairments of cognitive and depressive disorders and borderline intellectual

functioning" and, "the state agency limitations accepted by the ALJ".[7]  Defendant claims

substantial evidence supports the ALJ's RFC determination.  (Dkt. No. 13, p. 17).

In the context of formulating the RFC, the ALJ discussed plaintiff's medical treatment

with Sheila Singleton, RPA-C and Harold Horowitz, M.D at Syracuse Community Health

---

[7] Plaintiff does not specify the "state agency limitations" but the Court assumes plaintiff is referring to the January 23, 2005 Mental RFC completed by P.A. Spearman, Ph.D., at the request of the agency.  Dr. Spearman opined that plaintiff has, "moderate limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workweek without psychologically based interruptions".  (T. 28, 160-162).

Center.[8]  On April 1, 2003, plaintiff was treated by PA Singleton for chest pain and high blood

pressure.[9]  PA Singleton noted that plaintiff's high blood pressure was the result of "poor control

and compliance" and gave plaintiff a prescription for Atenolol.[10]  (T. 126).  On April 29, 2003,

PA Singleton noted that plaintiff's blood pressure was stable. (T. 121).  On July 29, 2003, PA

Singleton diagnosed plaintiff with GERD and prescribed Nexium but noted that alcohol may be

an irritant.[11]  PA Singleton also noted that plaintiff's hypertension was "poorly controlled". (T.

115).  On October 28, 2003, PA Singleton noted that his blood pressure was stable. (T. 112).  On

January 28, 2004, PA Singleton saw plaintiff as a "follow up" for complaints for diarrhea but

noted that the problem subsided.  PA Singleton also diagnosed plaintiff with non-insulin diabetes

and started plaintiff on medication. (T. 177).  On August 31, 2004, plaintiff complained of

diarrhea but denied experiencing chest pain or shortness of breath.[12] (T. 16).  PA Singleton noted

that plaintiff's blood pressure was elevated and diagnosed plaintiff with hypertension and chronic

diarrhea and referred plaintiff to the GI clinic. (T. 16).  On October 18, 2004, plaintiff advised

---

[8] RPA-C is an abbreviation for Registered Physician Assistant-Certified.  http://www.medilexicon.com (last visited August 19, 2010). Dr. Horowitz specialized in podiatry.

[9] Although the report indicates that this visit was a follow up, the record does not include any reports from PA Singleton prior to April 2003.

[10] Atenolol is used in the treatment of hypertension. *Dorland's Illustrated Medical Dictionary*, 173 (31st ed. 2007).

[11] GERD is an abbreviation for Gastric Esophageal Reflux Disease. http://www.medilexicon.com (last visited August 19, 2010).  Nexium is a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of GERD.  *Dorland's* at 634, 1293.

[12] Although not specifically cited by plaintiff, he seemingly relies upon records submitted to the Appeals Council. Even if the Appeals Council denies review, evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record to be considered on judicial review.  *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  The role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision.  *Woodford v. Apfel*, 93 F.Supp.2d 521, 528 (S.D.N.Y. 2008).

that a colonoscopy was scheduled and PA Singleton noted that his blood pressure was elevated. (T. 15).  On November 29, 2004, plaintiff was examined for a refill of his prescriptions.  He advised that the diarrhea resolved and although he had a colonoscopy, the results were not available for Singleton's review.  Plaintiff denied experiencing any chest pain and asked for a prescription for Viagra.  PA Singleton noted that plaintiff's hypertension was stable and gave him a prescription for Viagra.  (T. 14).  Plaintiff advised that he was going to Florida for "a few weeks". (T. 14).

From April 2003 through October 2003, plaintiff had seven visits with Dr. Horowitz for complaints of pain in his right foot as a result of frostbite. (T. 123).  Plaintiff was diagnosed with a right sub-hallux ulcer.[13] (T. 123).  In April 2003, Dr. Horowitz noted that the ulcer healed well and noted plaintiff's prognosis as "good". (T. 123).   In May 2003, Dr. Horowitz noted that the ulcer "totally healed" and gave plaintiff a prescription for orthopedic shoes and cleared him for his license to be a barber. (T. 120).  In June 2003, plaintiff had no complaints. (T. 118).  In July 2003, plaintiff complained of pain when he stood on his feet all day.  Dr. Horowitz found no objective evidence of abnormalities and advised plaintiff to work part-time rather than full-time. (T. 117).  On July 28, 2003, Dr. Horowitz examined plaintiff and opined that although plaintiff could return to work as normal, "the patient states it is really hard for him to work.  I recommended that he return to the hours that he is currently doing but nothing less than that. Eventually, the patient will return to full active duty." (T. 116).  On October 24, 2003, Dr. Horowitz saw plaintiff for "routine foot care". (T. 113).

---

[13] A sub-hallux ulcer is a local defect, or excavation, of the surface of the big toe, which is produced by the sloughing of inflammatory necrotic tissue. *Dorland's* at 829, 2025.

In December 2003, plaintiff returned to the Health Center with disability paperwork stating that his toe hurt too much and that he could not work.  Dr. Horowitz noted, "[t]he patient states he does not want to look for a job and he is not interested in working. He wants me to fill these papers out.  Explained to the patient that we could not fill this out because he is not disabled at this point.  He previously had a frostbite injury that was cured and taken care of". (T. 183).  Upon examination, Dr. Horowitz noted that plaintiff had some mild neuropathy in the area of the frostbite injury but noted, "however, the area is totally healed".  Although plaintiff complained of pain, the doctor found no evidence of pain on palpation.  Dr. Horowitz instructed plaintiff to return to work as he, "could not be out of work for this situation" and further advised plaintiff to take over the counter medication as needed.  Dr. Horowitz concluded his report stating, ". . . he must go back to work.  He really does not want to go to work at this time and we can not keep him out of work any longer". (T. 183).

The ALJ also relied upon the conclusions of the consultative examiner, Kalyani Ganesh, M.D.  On December 30, 2003, Dr. Ganesh conducted an internal medicine examination at the request of the agency.  Plaintiff reported that he had laser surgery on his eyes in August 2003, that he was diagnosed with diabetes and had a prescription but was not taking the medication and that he had high blood pressure which may not be controlled.[14]  (T. 131). Upon examination, Dr. Ganesh noted that plaintiff's vision was 20/40 in both eyes and that his blood pressure was 110/74 (T. 132).   Dr. Ganesh provide a Medical Source Statement and opined that plaintiff had, "no gross limitation to sitting and the use of upper extremities.  He has a moderate degree of limitation to standing, walking and climbing". (T. 134).

---

[14] The record does not contain any reports regarding this surgery.

The record also contains a Physical Residual Functional Capacity Assessment completed by a "DIB Analyst" on January 12, 2004.  (T. 94).  The analyst noted plaintiff's primary diagnosis as hypertension with a secondary diagnosis of diabetes. (T. 94).  The analyst opined that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit for a total of 6 hours in an 8 hour workday and had an unlimited ability to push and/or pull. (T. 95).

The records provided to the Appeals Council included the results of an ECG and stress test from September 2005.[15]  The testing was positive for myocardial ischemia.[16] (T. 211). Plaintiff also submitted reports from eye examinations conducted at Syracuse Community Health Center in March and April 2005.[17]  In March 2005, plaintiff complained of decreased vision after laser surgery "one year ago" with dizziness and headaches. (T. 199).  Plaintiff was advised to return in two weeks for a follow up with a doctor. (T. 200).  On April 8, 2005, plaintiff returned complaining of headaches.  (T. 197).  Plaintiff was diagnosed with hypertension and non-insulin dependent diabetes.  The doctor gave plaintiff a "note for PCP" regarding the need to control plaintiff's blood pressure and glucose levels.[18]  (T. 198).  The record before the Appeals Council

---

[15] ECG is an abbreviation for electrocardiogram.  http://www.medilexicon.com (last visited August 19, 2010).

[16]  Myocardial ischemia is the deficiency of blood supply to the heart muscle, due to obstruction or constriction of the coronary arteries. *Dorland's* at 975.

[17]  The record also contains a report from August 2005 wherein plaintiff complained of blurriness. The doctor's impressions and recommendations are illegible. (T. 196).

[18] PCP is an abbreviation for primary care physician. http://www.medilexicon.com (last visited August 19, 2010).

contains a copy of an undated note which states, "eye exam shows nonproliferative diabetic retinopathy.  Strict glc and bp control needed."[19] (T. 195).

       In addition to discussing and summarizing the medical evidence, the ALJ analyzed plaintiff's credibility within the context of the RFC determination.[20]  The ALJ found, "the credibility of [plaintiff's] subjective complaints (and allegedly related functional limitations) to be very poor".  (T. 26).  The ALJ declined, "to accept that [plaintiff's] impairments result in the degree of limitation alleged by the claimant". (T. 26).  The ALJ thoroughly discussed plaintiff's daily activities including his ability to do laundry, clean, care for his own hygiene and groom.  The ALJ also noted inconsistencies in plaintiff's testimony regarding his alcohol and marijuana use and the record.  The ALJ noted that during his consultative examination with Dr. Ganesh on December 23, 2003, plaintiff claimed that he stopped drinking one year earlier.  (T. 131).  Conversely, the ALJ also noted that in July 2003, P.A. Singleton noted that plaintiff "had an alcohol smell on his breath"and that plaintiff admitted to drinking while on vacation for the previous two weeks. (T. 115).  The ALJ also discussed Dr. Horowitz's concerns regarding plaintiff's unwillingness to work, plaintiff's conservative treatment and the ALJ's observations of plaintiff during the administrative hearing.  Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain and adequately specified the reasons for discrediting plaintiff's statements.

----

[19] The name of the physician who signed the prescription is illegible.  Nonproliferative diabetic retinopathy is a disease of the retinal blood vessels that may result in capillary closure.  *Dorland's* at 1659.  GLC is an abbreviation for glucose. http://www.medilexicon.com (last visited August 19, 2010).

[20] The plaintiff does not challenge the credibility determination.

Based upon the medical record and the credibility assessment, the ALJ found that plaintiff had the RFC to:

> perform light exertional activities of occasional lifting of twenty (20) pounds and more frequent lifting of ten (10) pounds. I grant the claimant the benefit of the doubt in regard to his foot pain, and further limit him to standing at one hour intervals. (T. 28).

The ALJ further stated:

> This is consistent with the opinion of Dr. Ganesh, consultative examiner, who found the claimant to have moderate limitations in standing, walking and climbing but no gross limitations in sitting or the use of upper extremities. (T. 28).

The ALJ also discussed plaintiff's mental impairments and concluded:

> Given the claimant's borderline intellectual functioning, the medical expert for the state agency below, also found moderate limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday/workweek without psychologically based interruptions. These conclusions are even more restrictive than the objective findings of Dr. Hartman wherein the claimant's attention, concentration, and memory were found to be only mildly impaired. Moreover, Dr. Hartman found the claimant's thought processes to be coherent and goal directed. Although I acknowledge that such limitations imposed by the state agency medical expert, are quite liberal, I grant the claimant the benefit of the doubt and accept these limitations. As such, I find that he retains the ability to perform simple routine work without significant public contact. I [] find no merit for further reductions. (T. 28).

The ALJ concluded that plaintiff had the RFC to perform a significant range of light work.[21] Upon review of the entire record, the Court finds that the ALJ applied the correct legal

---

[21]   Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for

analysis in determining plaintiff's RFC.  Moreover, the RFC is supported by substantial evidence.

Plaintiff's arguments are conclusory and wholly contradicted by the record.  Indeed, in his brief,

plaintiff does not cite to any portion of the medical record in support of his claim that the RFC

does not contain all of plaintiff's impairments.  With regard to plaintiff's physical impairments,

the ALJ properly discussed and evaluated the opinions of the consulting examiners, plaintiff's

treating physician (Dr. Horowitz) and the physician's assistant.  While Dr. Horowitz did not

provide a functional analysis of plaintiff's abilities to do work-related activities, Dr. Horowitz

clearly opined that plaintiff was not disabled as a result of his foot impairment and could/should

return to work.  There are no reports or opinions from any physician supporting plaintiff's claim

that he suffers from vision impairments.   Further, P.A. Singleton's records indicate that

plaintiff's diarrhea "resolved" and plaintiff made no complaints regarding this condition after

August 2004.  There is no evidence of any treatment for plaintiff's complaints of chest pains and

no diagnosis of myocardial ischemia by any treating physician.  Based upon the record, the ALJ

properly relied upon the Physical RFC prepared by the DIB analyst since the analyst is deemed to

be a qualified expert in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6),

404.1513(c), 404.1527(f)(2), 416.912(b) (6), 416.913(c), and 416.927(f)(2).

        With respect to plaintiff's mental impairments, the record does not support plaintiff's

claim that he suffers from "severe mental impairments".  As discussed supra, plaintiff has never

been under the care of any mental health professional.  The record does not contain any reports or

opinions from any treating source with respect to plaintiff's cognitive abilities.  Moreover, the

---

long periods of time.

20 C.F.R. § 404.1567(b).

record does not establish that plaintiff underwent any intelligence testing prior to the examination

with Dr. Hartman in October 2003.  The ALJ's reliance on Dr. Hartman's and Dr. Spearman's

opinions was proper as their conclusions are not contradicted by any evidence in the record.  *See*

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("In assessing opinions, a written report

by a licensed physician who has examined plaintiff may constitute substantial evidence

supportive of a finding by the hearing examiner"); *see also Diaz v. Shalala*, 59 F.3d 307, 313, n. 5

(2d Cir. 1995) (an ALJ may rely upon the opinions of the state agency consultants when the

evidence in the record supports the conclusions).

Plaintiff also claims that the ALJ's RFC provided, "a sit/stand option" which, when

considered with the effects of his severe diabetes and neuropathies, was inconsistent with light

work.  Defendant argues that the ALJ's RFC determination does not include such an extensive

limitation.  Rather, defendant claims that the ALJ's reduction for light work was only to the

extent that plaintiff  was limited to standing for one-hour intervals and this did not amount to an

unequivocal statement that plaintiff required the sit/stand option as described in SSR 83-12. (Dkt.

No. 13, p. 22).

When the only limitation on plaintiff's ability to do a full range of light or sedentary work

is the need to be able to alternate between sitting and standing positions, this would not affect the

remaining occupational base of light and sedentary work available to plaintiff.  *Williams v.*

*Comm'r of Social Sec*., 2010 WL 2401280, at *8 (N.D.N.Y. 2010) (citing SSR 83-12, 1983 WL

31253, at *2 (S.S.A.1983)).  With regard to plaintiff's diabetes, the record does not contain any

opinion by any treating or consultative source indicating that this impairment imposes significant

limitations upon plaintiff's ability to perform work related activities.  Indeed, the record indicates

that plaintiff was non-compliant with his medications, and the Second Circuit has held that

remediable impairments are not disabling. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.

1983) (physicians were frustrated by the plaintiff's refusal to help himself concerning his

hypertension and diabetes) (citations omitted).  As previously discussed, the record does not

support plaintiff's claim that his foot impairments result in limitations that affect his abilities to

do work related activities.  To the contrary, Dr. Horowitz repeatedly advised plaintiff to return to

work and refused to sign disability paperwork.  Accordingly, the Court finds that substantial

evidence supports the ALJ's RFC determination and his conclusion that plaintiff can perform

simple, routine light work.

**C.     Grids**

As part of the final step of the sequential analysis, the ALJ discussed the Medical-

Vocational Rules.  The ALJ noted:

> If the claimant retained the residual functional capacity to perform a
> full range of light work, Grid Rule 202.13 would apply and direct a
> finding of "not disabled".  Since, however, the claimant has non-
> exertional limitations, the Grid Rule is not dispositive and is used only
> as a framework for decision-making. (T. 29).

Plaintiff claims that the ALJ erroneously relied upon Medical-Vocational Rule 202.13 as a

framework for the decision.   Plaintiff alleges that the ALJ should have utilized Medical

Vocational Rule 201.09 which involves an RFC for maximum sustained work capability limited

to sedentary work and includes individuals with "limited or less" education.  20 C.F.R., Pt. 404,

Subpt. P, App. 2.  Defendant claims that the ALJ appropriately utilized Grid 202.13 which

corresponds to an RFC with maximum sustained work capability limited to light work and

includes individuals who are "high school graduate[s] or more".  *Id.*

22

The Court has determined that the ALJ's RFC analysis and conclusion that plaintiff has the ability to do light work is supported by substantial evidence. The Court rejected plaintiff's argument that he retained the ability to do no more than sedentary work. *See supra* Part B. Plaintiff claims he, "does not read and has limited writing ability" and asserts that his educational level, "is marginal at best". Plaintiff's arguments are unsupported by the record. Plaintiff stated that he could read and understand English and write more than his name in English. (T. 79). Plaintiff completed high school and attended regular classes. Based upon the record, the Court finds that the ALJ appropriately utilized Rule 202.13 as part of the fifth step of the analysis.

**D.   Vocational Expert**

Continuing with the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work. 20 C.F.R. §§ 416.920, 416.960. Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations. *Id.* at 606. For example, use of the grids as the exclusive framework for making a disability determination may be precluded where, as here, plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work he can perform. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*,

802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating "where nonexertional limitations significantly diminish the ability to perform a full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ posed three hypothetical questions to the vocational expert. (T. 239-240). First, the ALJ asked the vocational expert to assume that an individual of plaintiff's age, education and work history was "limited to light work, that is no more than, lifting no more than 20 pounds on occasion, 10 pounds frequently. I want you to also assume that the individual is limited to simple, routine work, without a significant amount of public contact and assume that the individual's ability to stand is limited to one hour at a time". (T. 239). In response, the vocational expert testified that such an individual would be able to do the job of a semi-conductor bonder and label pinker.[22] (T. 239-240). The ALJ also asked if there were additional sedentary

_____

[22] The expert explained that a "label pinker" was a machine tending operator on a bench. (T. 240).

jobs that the individual could perform and the expert identified the job of slicing machine tender. (T. 240-241). The third hypothetical question contained the same limitations however, the ALJ asked the expert to assume the individual had severe limitations in the ability to maintain attention, concentration or task persistence. (T. 241).   In response to that hypothetical, the expert testified that there were no jobs available to such an individual.  (T. 241).

### 1.      Incomplete Hypothetical

Plaintiff argues that the hypotheticals posed to the vocational expert did not include all of the plaintiff's impairments and thus, the testimony was fatally deficient.  As discussed previously, the ALJ's RFC analysis was supported by substantial evidence.  There is no support for plaintiff's contention that he suffered from additional impairments that were improperly omitted from the RFC.  Accordingly, this argument lacks merit.

### 2.      Non-exertional Impairments and Reliance on Hypothetical

Plaintiff argues that he suffers from "severe mental impairments" including borderline intellectual functioning and cognitive/depressive disorders which present "significant non-exertional limitations".  Plaintiff argues that these limitations should have been presented to the vocational expert.  Despite plaintiff's argument to the contrary, the ALJ addressed these non-exertional limitations in the third hypothetical to the expert and discussed the expert's response in the decision:

> The ALJ asked the vocational expert to consider the previous exertional and non-exertional limitations [], and also to assume that such a hypothetical person had severe limitations in attention, concentration, and task persistence.  On all these assumptions, the vocational expert was asked whether the claimant could perform any of the unskilled jobs which he previously cited.  The vocational expert replied that all cited jobs would be eliminated.  However, for the

reasons set forth above, I do not find substantive evidence to warrant
such limitations and thus, reject such further hypothetical.  (T. 29).

As discussed supra, the record does not support plaintiff's claim that he suffered from "severe mental impairments".  Thus, the ALJ properly rejected the expert's response to the third hypothetical.  Dr. Hartman opined that plaintiff had only "mild difficulties" with attention, concentration and learning new tasks, mild difficulties relating to others and moderate problems dealing with stress.  (T. 144).  Dr. Spearman found that plaintiff was not significantly limited in his ability to understand and remember short/simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual without being distracted by them. (T. 161).  Dr. Spearman also concluded that plaintiff was not significantly limited in any social interaction or adaptation. (T. 161).

Even in cases "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder, [the ALJ]."  *Taylor v. Astrue*, 2008 WL 3884356, at *17  (N.D.N.Y. 2008) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990)). Based on substantial evidence in the record, the ALJ properly presented and relied upon the first hypothetical question posed.  The ALJ did not err by failing to adopt the expert's opinion from the third hypothetical.  *See Wanzo v. Comm'r of Social Sec*., 2008 WL 3925542, at *20 (N.D.N.Y. 2008) (the ALJ properly rejected a hypothetical that was not supported by substantial evidence).

### 3.    General Education Development Reasoning Levels

Plaintiff argues that the two jobs cited by the expert have General Educational Developmental Reasoning Levels of "2" and thus, under the Dictionary of Occupational Titles ("DOT"), require the ability to, "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in

or from standardized situations". (Dkt. No. p., 21).  Plaintiff asserts that these jobs are

inconsistent with plaintiff's mental limitations and claims that the expert failed to address that

conflict.

Pursuant to Social Security Ruling 00-4p, an ALJ must "[i]dentify and obtain a reasonable

explanation for any conflicts between occupational evidence provided by VEs [vocational

experts] and information in the DOT." *Mendez v. Barnhart*, 2007 WL 186800, at *13 (S.D.N.Y.

2007); *see also Berman v. Comm'r of Soc. Sec.*, 2007 WL 2178073, at *1 (E.D.N.Y. 2007).

When such conflicts arise, the ALJ must "[e]xplain in the determination or decision how any

conflict that has been identified was resolved."   SSR 00-4p, 2000 WL 1898703, at *2 (S.S.A.

2000).  An ALJ's failure to follow SSR 00-4p is harmless where there is no conflict between the

expert's opinion and the DOT.  *See Massachi v. Astrue*, 486 F.3d 1149, 1154, n. 9 (9th Cir. 2007).

The GED (General Education Development) scale is composed of three divisions:

Reasoning Development, Mathematical Development, and Language Development.  *See*

http://www.occupationalinfo.org/appendxc_1.html#III (last visited August 19, 2010).  A GED

scale of 2 is described as follows:

> 02 LEVEL REASONING DEVELOPMENT Apply commonsense
> understanding to carry out detailed but uninvolved written or oral
> instructions. Deal with problems involving a few concrete variables in
> or from standardized situations.

*Id*.   Here, the jobs identified by the vocational expert, including semi-conductor bonder (DOT #

726.685-066), label pinker (DOT# 585.685-062), and machine tender (DOT # 585.685-062), have

a GED reasoning scale (GED-R) of 2.  Working at reasoning level 2 does not contradict a

mandate that work be simple, routine and repetitive.  *Money v. Barnhart*, 91 F. App'x 210, 215

(3ʳᵈ Cir. 2004); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10ᵗʰ Cir. 2005 ) (holding that

level 2 was consistent with "simple and routine work tasks").

During the hearing, the vocational expert defined the occupations as "light level".  (T.

239).  The ALJ specifically asked the expert:

> Q.    And the jobs that you cited to me, are they consistent with their description in
> the Dictionary of Occupational Titles?
>
> A.    Yes, they are, Your Honor. (T. 241).

In the decision, the ALJ explained:

> [t]he ALJ asked the vocational expert whether the [] jobs conflict with information
> provided in the Dictionary of Occupational Titles (DOT), including any companion
> publications such as the Selected Characteristics of Occupational Titles (SSR 00-4p).
> The vocational expert responded that the jobs cited were consistent with the DOT and
> all companion publications. (T. 29).

As discussed, substantial evidence supports the ALJ's RFC analysis and determination

that plaintiff could perform unskilled light work.  Plaintiff has not specified why he is unable to

perform these jobs and based upon the record, the Court finds his argument unpersuasive.  *See*

*Jackson v. Astrue*, 2007 WL 1428442, at *9 (W.D.N.Y. 2007) (the plaintiff did not explain why

she could not meet the GED requirements of the jobs identified by the expert).  Plaintiff

completed high school, worked for many years, handles money and lives alone.  The jobs

identified by the expert are not incompatible with the limitations established by the ALJ - notably,

that plaintiff can perform simple routine work without significant public contact.  *See Cross v.*

*Astrue*, 2009 WL 3790177, at * 8 (N.D.N.Y. 2009) (holding that the ALJ's determination that the

plaintiff's work must be simple, low-stress and entry level, with no complex decision-making, no

planning, scheduling or report writing, no multi-tasking and little change in the work environment

and infrequent interaction with the public or co-workers was consistent with jobs identified with a

GED of 2 or 3).  Upon review of the record, there is no "conflict" between the vocational expert's

testimony and the DOT and the ALJ did not err when he relied upon the testimony of the

vocational expert.

**VII.    CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings is **GRANTED**; and it

is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral

to a Magistrate Judge has been **RESCINDED**, as such, any appeal taken from this Order will be

to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Date:    September 15, 2010

Norman A. Mordue
Chief United States District Court Judge